IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LINDA STIMSON, | ) | CASE NO. 1:14CV1660 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Linda Stimson ("Stimson") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her application for

Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the

parties.  Doc. 17.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

**I. Procedural History**

Stimson filed an application for DIB on May 11, 2010, alleging a disability onset date of

November 4, 2008.  Tr. 36, 165.  She alleged disability based on the following: asthma and three

strokes.  Tr. 194.  After denials by the state agency initially (Tr. 96, 101) and on reconsideration

(Tr. 98, 108), Stimson requested an administrative hearing.  Tr. 115.  A hearing was held before

Administrative Law Judge ("ALJ") C. Howard Prinsloo on January 31, 2012.  Tr. 57-94.  In his

February 22, 2012, decision (Tr. 36-49), the ALJ determined that there were jobs that existed in

significant numbers in the national economy that Stimson could perform, i.e., she was not

disabled.  Tr. 48.  Stimson requested review of the ALJ's decision by the Appeals Council (Tr. 32) and, on May 27, 2014, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Stimson was born in 1962 and was 47 years old on the date her application was filed.  Tr. 190.  She completed twelfth grade.  Tr. 195.  She previously worked as a manager in a pizza shop and in sales at a tanning salon.  Tr. 195.  She last worked in August 2008.  Tr. 195.

### B.  Medical Evidence

On November 4, 2008, Stimson visited the emergency room complaining of headache, dizziness, slurred speech, fatigue, weakness, and falling to the left when she stands.  Tr. 538, 559.  A CT scan of her brain showed left occipital findings suggestive of an infarct being most likely subacute.  Tr. 546.  She was diagnosed with a stroke and hypertension and transferred to Kaiser Permanente on November 5, 2008.  Tr. 560.

Upon admittance at Kaiser, Stimson described her symptoms at the onset: her speech became slurred, her tongue drifted to the left side of her mouth, she was unable to use her left hand, which felt heavy and clumsy below her elbow, she drifted to the left when she walked, and she had a headache. Tr. 307.  By the time she got to the emergency room, her headache had resolved, she was no longer slurring, and she had regained control of her hand.  Tr. 307.  She still drifted to the left when she walked, although to a lesser degree.  Tr. 307.

An MRI of Stimson's brain taken on November 5 showed multiple focal lesions within her cerebral hemisphere bilaterally with restricted diffusion suggesting probable multiple infarct possibly embolic, and periventricular and subcortical white matter lesions on cerebral

hemisphere that were nonspecific.  Tr. 308.  Medical staff notes indicated that possible

demyelination disease should also be considered.  Tr. 308, 367.  A CT scan of her brain taken

November 7 showed subacute cerebellar infarcts, a 5 millimeter left internal carotid aneurysm,

and degenerative disease of her cervical spine.  Tr. 293-294.  Her symptoms improved during her

hospital stay.  Tr. 281.  On November 7, 2008, her attending physician began reviewing her

charts in anticipation of discharge; before his review was complete, Stimson "demanded

immediate discharge" and left despite her physician advising her to wait.  Tr. 273, 281-283.

On May 21, 2009, Stimson returned to Kaiser for her annual checkup.  Tr. 271.  She

reported having no medical problems since November 2008 aside from hypertension.  Tr. 271.

She stated that her blood pressure increases when she visits the doctor but that at home her blood

pressure range is 126 over 70.  Tr. 271.  She reported feeling well and had no neurological

complaints; a neurological examination was normal.  Tr. 271.

On August 14, 2009, during an office visit at Kaiser, Stimson complained of feeling

dizzy and said she did not want to run out of her hypertension medication.  Tr. 338.  She reported

taking her hypertension medication as prescribed with no side effects.  Tr. 339.  She was

diagnosed with benign hypertension and acute sinusitis.  Tr. 339.

On September 1, 2009, Stimson went to the emergency room complaining of back pain

after moving a bed a few days prior.  Tr. 334-335.  Upon examination, she had a limited range of

motion in her back, positive straight leg raising bilaterally, and normal reflexes, strength, and

sensation in her legs.  Tr. 336.  Her speech was normal with no neurological focal findings or

movement disorder.  Tr. 336.  She advised that medication provided good pain relief; she was

given a prescription and discharged the same day, "ambulatory without complaints."  Tr. 334,

336.

On December 13, 2009, Stimson visited the emergency room at around 8:45 p.m. complaining of a headache that had started around 8 a.m. that morning.  Tr. 326.  She reported her stroke in 2008 that resulted in the loss of the use of the left side of her body and speech for 48 hours; then "all symptoms resolved" and she had no residual symptoms from the stroke.  Tr. 326.  Upon examination, a nurse found that Stimson's hand grasp and leg strength were "strong and equal" on both sides and that she had no speech problems or facial droop.  Tr. 326.  She had normal motor activity.  Tr. 327.  The nurse administered IV medication and, two hours later, Stimson's headache pain had "completely resolved" and her pain level was zero on a ten-point scale.  Tr. 326.  Just after midnight, Stimson saw the attending physician and reported that she had been "doing well [un]til today."  Tr. 327.  She denied any weakness on her left side or blurry vision.  Tr. 3273-328.  A CT scan revealed a low attenuation area in her left cerebellar hemisphere, a possible old infarction or tumor.  Tr. 366.  An MRI taken on December 15, 2009, showed "stable increased signal intensity left occipital parietal area.  Post inflammatory versus degenerative changes of the left cerebellar hemisphere when compared to the prior MR examination of 11/5/08."  Tr. 365.  The radiologist noted that the imaging results were atypical of demyelinating disease and more indicative of an inflammation.  Tr. 365.

On April 26, 2010, Stimson requested a refill of hypertension medication, after "knock[ing] her atenolol into the toilet."  Tr. 322-323.  She reported increased stress since trying to take care of her mother who had been diagnosed with breast cancer.  Tr. 323.

On May 12, 2010, Stimson sought follow up treatment for her blood pressure and cholesterol.  Tr. 319-320.  She complained of financial issues and stated that she was unable to work.  Tr. 319.  She again reported her blood pressure was usually in the 120 over 70 range.  Tr. 319.

On September 23, 2010, Stimson saw Helen M. Kollus, M.D., complaining of head pain across the back of her head that lasts for 15 minutes, occurring three to four times per week over the past three weeks.  Tr. 447.  She also reported having a "black dot in front of her right eye" for the past two weeks and insomnia due to stress over her mother's illness.  Tr. 447.  She declined counseling or medications.  Tr. 450.  Dr. Kollus referred her to a neurologist.  Tr. 450.

On October 6, 2010, Stimson saw neurologist Karla J. Madalin, M.D., for a general neurology consultation based on her history of a stroke, intracranial aneurysm, "head pain (not headache)," and the black dot in her vision.  Tr. 434-435.  Stimson reported suffering residual symptoms since November 4, 2008, including mild left-sided weakness and decreased balance. Tr. 436.  She described that her headaches occurred every other day, lasted 10 to 15 minutes, and were accompanied by tenderness at the back of her neck.  Tr. 436.  She reported "sometimes" taking Tylenol for her headaches and that it provided "some help"; otherwise, she waited for her headache to go away.  Tr. 436.  Upon examination, her recent and remote memory was intact and her attention span, concentration, speech, and comprehension were all normal.  Tr. 442.  She had no spasms or tenderness in her back or neck and had full range of motion.  Tr. 442.  She had normal toe and heel walking and normal Romberg,[1] but her tandem walking was "slightly unsteady."  Tr. 443.  Her muscle tone, bulk, and strength were normal, with some mild weakness in the left upper extremity.  Tr. 442.  Her coordination and senses were normal.  Tr. 442.  Her reflexes were 1 or 2 out of 4.  Tr. 442.  Dr. Madalin diagnosed Stimson with aneurysm ("incidental and not causing problems"), stroke (previous right and left strokes), tobacco dependence ("not ready to quit"), claustrophobia (intolerant of MRI), headache, mixed ("does not appear to be due to migraine"), and vision disorder ("possible floater OD. Does not appear to

---

[1]  Romberg refers to a test or sign in which one observes whether the body sways or falls when the patient stands with feet close together and eyes closed.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1715.

be related to headaches, aneurysm, or previous stroke"). Tr. 434, 443. She prescribed Tizanidine for muscle spasms as needed. Tr. 443.

On October 7, 2010, Simpson saw Ellen Frank, M.D., for an eye exam. Tr. 431. Stimson relayed her history of her stroke, describing that, after 48 hours, "everything came back to normal" except her left hand, which she stated shakes and has less strength, causing her to "drop everything." Tr. 429. Dr. Frank diagnosed "vitreous floaters or opacity" and a cataract. Tr. 431. Stimson reported that she was able to read "ok" with over-the-counter readers. Tr. 431. Dr. Frank advised her to return within six months for monitoring of her cataracts, stating, "this type of cataract can progress quickly." Tr. 431.

An MRI of Stimson's brain taken on October 11, 2010, revealed remote left cerebellar hemispheric infarct, mild nonspecific periventricular white matter changes, and no signs of acute infarct. Tr. 627. When compared to her previous MRI, the changes were described as stable. Tr. 627. Also on October 11, 2010, Stimson had an x-ray taken of her cervical spine which showed degenerative changes. Tr. 525. A Magnetic Resonance Angiogram (MRA) of her intracranial circulation indicated that the size of her internal carotid aneurysm had not significantly changed. Tr. 526.

A treatment note from a January 19, 2011, appointment with Dr. Madalin states, "Patient left without being seen ("I was running 1 ½ hours late."). Tr. 671. Stimson saw Dr. Madalin again on June 29, 2011, complaining, "My left hand is worse, my memory is shot to smithereens." Tr. 671. Of her left hand, Stimson described weakness, decreased feeling, that she "drops things" and that she has a "tremor" that has been present since the time of her cerebellar stroke. Tr. 671. She continued to suffer headaches a "few times per week" lasting "up to all day." Tr. 671. Her headaches were triggered by weather changes. Tr. 671. She was not

using any medication to treat her headaches.  Tr. 671.  She had stopped taking Tylenol because she felt it was not working; Dr. Madalin noted that she has not taken gabapentin.  Tr. 671.  Physical examination results were the same as in October 2010, except that her reflexes were 2/4, her tandem walking was unsteady, and she swayed during her Romberg test.  Tr. 442-443.

On November 30, 2011, Stimson underwent a head MRA, with a comparison made to her result in October 2010.  Tr. 712, 755).  The MRA revealed no significant change in her aneurysm, no additional aneurysm, and no evidence of significant stenosis.  Tr. 712, 755.  The same day, an MRI of her brain showed "nonspecific periventricular and subcortical white matter changes" and an "old left cerebellar infarct" with "no significant change" from her October 2010 MRI.  Tr. 713, 756.

### C.  Medical Opinion Evidence

#### 1.  Dr. Madalin's Opinion

On November 16, 2011, Dr. Madalin completed a Medical Source Statement.  Tr. 555-556.  Dr. Madalin opined that, because of left hemiparesis,[2] Stimson could only lift/carry five pounds; stand/walk two hours in an 8-hour day for ½ hour without interruption; and could rarely or never climb, balance, stoop, crouch, kneel, or crawl.  Tr. 555.  She found that Stimson could rarely or never reach, handle, feel, push, pull, or perform fine or gross manipulation.  Tr. 556.  She noted that Stimson had environmental restrictions, needed a sit-stand option, and needed unscheduled breaks.  Tr. 556.  She indicated that Stimson experiences severe pain.  Tr. 556.  Dr. Madalin explained, "frequent migraines; unable to work when having migraine."  Tr. 556.

#### 2.  Consultative Examiners

On June 30, 2010, Stimson saw Mehdi Saghafi, M.D., for a consultative examination.  Tr. 372-376.  She complained of light-headedness, headaches, and weakness in her left hand.  Tr.

---

[2]  Hemiparesis is muscular weakness or partial paralysis affecting one side of the body.  *See* Dorlands, at 837.

372.  She explained that, in November 2008, she was unable to stand or walk and the left side of her face drooped.  Tr. 372.  She was right hand dominant.  Tr. 375.  She reported that she had no history of headache, numbness, tingling, or weakness in her face and left hand.  Tr. 374.  Upon examination, her cranial nerves were within normal limits and she had no evidence of paralysis.  Tr. 375.  Her tendinous reflexes were all 2+.  Tr. 375.  Her speech, hearing, memory, orientation, and attention were all within normal range.  Tr. 375.  Her manual muscle scores were normal, except that her left hand Dynamometer reading was 10 versus her right hand which was 30.[3]  The range of motion in her cervical spine was decreased.  Tr. 378.  Dr. Saghafi diagnosed hypertension and "CVA and cerebral aneurysm, per history."  Tr. 376.  He opined that Stimson could sit, stand, and walk six-to-eight hours per day; did not need an ambulatory aid; could lift and carry 30-35 pounds frequently and 36-70 pounds occasionally; and could push, pull, and manipulate objects.  Tr. 375.  She could operate hand and foot controlled devices, drive a car, travel, and climb stairs.  Tr. 375.

On July 19, 2010, Stimson saw psychologist Mitchell Wax, Ph.D., for a consultative examination.  Tr. 394-400.  She said she was unable to work due to medical problems.  Tr. 394.  She reported having had three strokes and a current aneurysm in her brain.  Tr. 394.  As a result, she experiences dizzy spells, headaches, balance problems, memory problems, high blood pressure, and is unable to "hold onto things with my left hand."  Tr. 394.  She last worked in July 2008, but quit due to "anger issues."  Tr. 395.  She said that she enjoyed reading, and read daily, but could not remember what she read.  Tr. 397.  Upon examination, Dr. Wax described Stimson as a "socially appropriate outgoing woman" although he observed that she become tearful during the evaluation.  Tr. 395.  She also had abnormal psychomotor activity, "fidgeting frequently with her hands," although she did not appear anxious or fretful.  Tr. 395-396.  Stimson reported

---

[3]  A Dynamometer instrument measures the strength of an individual's hand grip.  *See* Dorlands, at 575.

trouble concentrating and difficulty following conversations, although she was able to focus and attend during the evaluation.  Tr. 396.  She described herself as suspicious and exhibited paranoid ideation after having been robbed at work.  Tr. 396.

Stimson could recall five digits forward and three backwards but could not remember any of three simple words after five minutes.  Tr. 396.  She could "only marginally maintain her own living arrangements" and received assistance with household chores and received financial help from her parents.  Tr. 396.  Dr. Wax administered the Wechsler Adult Intelligence Scale Fourth Edition (WAIS-IV) and Stimson scored a 79.  Tr. 397, 400.  Dr. Wax commented on a "significant difference among her subtest scores" that was "indicative of organic problems."  Tr. 397.  During the evaluation, Stimson "often did not appear with memory problems or balance problems."  Tr. 397.

Dr. Wax diagnosed cognitive disorder based on Stimson's three strokes and her aneurysm.  Tr. 399.  He opined that her ability to relate to others was moderately impaired due to her organic problems, but that she was "pleasant and personable," "presented with good social skills," and that she would have "little difficulty working with others on a job."  Tr. 398.  He noted that she spoke to three friends every other day, was close to her parents, and described her as "a socially appropriate outgoing woman who could easily provide information about herself."  Tr. 395, 398.  Dr. Wax opined that Stimson's ability to understand, remember, and follow instructions was moderately impaired but that she would be able to understand, follow, and remember simple instructions.  Tr. 398.  He found that her ability to maintain attention, concentration, and persistence was moderately impaired, but that her pace was normal and she was persistent and did not present any problems focusing or attending to tasks during the evaluation.  Tr. 398.  Dr. Wax stated that her ability to withstand the stresses and pressures

associated with day-to-day work activity was mildly impaired and that she could perform simple, repetitive tasks.  Tr. 398.

### 3.  State Agency Reviewers

On August 10, 2010, David Demuth, M.D., a state agency physician, reviewed Stimson's file.  Tr. 401-403.  Dr. Demuth gave the most weight to Dr. Wax's opinion in assessing Stimson's mental residual functional capacity (RFC).  Tr. 403.  Accordingly, Dr. Demuth opined that Stimson could perform: moderately detailed tasks, tasks in situations where duties are relatively static and changes can be explained, and tasks that do not require independent prioritization or more than daily planning.  Tr. 403.  She can sustain tasks as long as they involve occasional and superficial interaction with others, and cannot work in situations in which she would need to resolve conflicts or maintain a friendly and persuasive demeanor.  Tr. 403.  On November 15, 2011, state agency psychologist Bruce Goldsmith, Ph.D., affirmed Dr. Demuth's opinion.  Tr. 553.

On August 18, 2010, state agency physician Dimitri Teague, M.D., reviewed Stimson's file and stated that there was no evidence of a severe physical impairment currently.  Tr. 419.  On November 18, 2010, state agency physician Elizabeth Das, M.D., affirmed Dr. Teague's opinion.  Tr. 557.

### D.  Testimonial Evidence

### 1.  Stimson's Testimony

Stimson was represented by counsel and testified at the administrative hearing.  Tr. 60-87.  She testified that she completed twelfth grade.  Tr. 60.  She lives by herself in an apartment.  Tr. 60.  She is able to drive and does so "a little bit"; she drives to the grocery store about a mile

away from her home.  Tr. 61.  She gets nervous if there is a lot of traffic and she does not like to travel far.  Tr. 61.

Stimson stated that she has not worked since November 2008.  Tr. 62.  She last worked in a tanning salon full time, taking care of walk-in customers, doing the cleaning and the laundry, stocking, and taking inventory.  Tr. 62.  The most she lifted was fifty pounds.  Tr. 62.  She alternated between sitting and standing, spending ¾ of her workday on her feet.  Tr. 63.  She stopped working there because she started having problems with her blood pressure.  Tr. 63.

Stimson testified that, prior to her job at the tanning salon, she worked in a pizza shop as a general manager.  Tr. 63.  She supervised twenty employees.  Tr. 63-64.  She worked full-time, "110 hours a week."  Tr. 64.  She was on salary but had to work long hours because she was the only one that could do certain things like run the cash register and "banking."  Tr. 81.  She was usually on her feet the whole time she was working and lifted at most about seventy-five pounds.  Tr. 64.  She had to attend training classes for about six weeks prior to becoming a manager.  Tr. 64.  She worked there from August through the holidays.  Tr. 64.   She stopped working there because the store closed.  Tr. 64-65.  She did not return to work after her stroke in November 2008 because of "the discussion I had with my neurologist . . . . I had lost my left side for a while" and for the first three months after her stroke she was trying to recuperate.  Tr. 83.

Stimson testified that her most severe symptom that prevents her from working is her headaches.  Tr. 66-67.  She has had them consistently since November 2008.  Tr. 67.  She gets them two to three times a month and they last from a couple hours to three days.  Tr. 67.  Her neurologist, Dr. Madalin, told her that her headaches were in part from her arthritis in her neck and in part from her aneurism located behind her right eye.  Tr. 68.  She takes prescribed medication that "relieves the pain in my neck and that seems to help the headaches."  Tr. 68.

11

Stimson stated that she also has problems with her memory.  Tr. 68.  Her short term memory is "pretty bad," and she has to leave post-it notes for herself so she does not forget to do things.  Tr. 68-69.  She explained that she can no longer remember telephone numbers.  Tr. 75.  Her balance and left arm have been affected as well.  Tr. 69.  She does not use a cane or brace and she fell one time as a result of her balance problems.  Tr. 71.  She stated that Dr. Madalin believes that her memory, balance, and arm problems are the result of her stroke in November 2008.  Tr. 69.  Her problems have remained the same since then—no better, no worse—and Dr. Madalin told her that her arm and memory issues are "as good as it's going to get."  Tr. 69-70. Dr. Madalin also told her that, because of her aneurysm, she is not allowed to lift over five pounds with her left arm.  Tr. 70.  She is right handed.  Tr. 70.  She explained that she drops things with her left hand because "I don't feel everything with my fingers, so I forget it's in my hand and it's, or my hand just doesn't grip and I end up dropping it."  Tr. 71.

Stimson also described neck pain that throbs; she stated that is it better now that she is taking medication.  Tr. 72.  On an average day, with mediation, she rated her neck pain as five on a scale of one through ten.  Tr. 72.  Her neck pain is also triggered by the weather and the position she sleeps in.  Tr. 72.  No doctor discussed treatment such as physical therapy, injections, or surgery.  Tr. 73.

Stimson testified that she has spots in her field of vision in her right eye.  Tr. 73.  Her doctors assume it was from the stroke because before that time her vision was fine.  Tr. 73.  She wears reading glasses and confirmed that no doctor discussed laser treatments or surgeries.  Tr. 74.

Stimson stated that her medications make her sleepy and that she sleeps ten hours a night and an hour or two during the day.  Tr. 75.  They also make her dizzy and lightheaded.  Tr. 75.

Her doctors cannot adjust or change her medications because "one of them is my blood pressure medicine." Tr. 76.  She is not able to do chores around the house with the exception of laundry, which she does twice a month if her son is unable to come over to do it.  Tr. 76.  She has to do very small loads because of the bending that is required.  Tr. 76.  She no longer has social activities; she used to go bowling three times a week, and went skating and sledding, but she cannot do these activities any more.  Tr. 77.  She goes out to eat with friends once a week.  Tr. 78.

When asked by the ALJ why the medical records show that she denied neurological problems after her stroke in 2008 she stated that she did not remember denying she suffered from these symptoms.  Tr. 83.  When asked why she did not receive any treatment for her post-stroke symptoms until 2011, she stated, "my neurologist put me on the medicine. I only see her once a year and I, some years I've been okay and then for months I'm not well, and it depends on, I don't know what it depends on, but sometimes I'm okay, sometimes I'm not."  Tr. 84-85.

Stimson testified that she could not go back to work in the tanning salon because she gets flustered very easily and her blood pressure "shoots through the roof."  Tr. 85.  She can no longer use a computer because of her left hand and she could not remember how do use a computer anymore because of her memory problems.  Tr. 85.  Currently, her blood pressure is controlled "75% of the time" with medication.  Tr. 87.

### 2. Vocational Expert's Testimony

Vocational Expert Mary Houck Kessler ("VE") testified at the hearing.  Tr. 87-93.  The ALJ discussed with the VE Stimson's past relevant work as a manager at a fast food restaurant and her job at a tanning salon.  Tr. 88.  The ALJ asked the VE to determine whether a hypothetical individual of Stimson's age, education and work experience could perform the jobs

she performed in the past if that person had the following characteristics: can perform light work but is limited to simple, routine, and repetitive tasks and cannot perform work at unprotected heights or around dangerous or moving machinery.  Tr. 89.  The VE testified that the person could not perform Stimson's past relevant work.  Tr. 68.  The ALJ asked the VE if there were any jobs that the individual could perform and the VE answered that the individual could perform jobs as a cashier (42,400 Ohio jobs, 1,126,400 national jobs), general office clerk (7,500 Ohio jobs, 359,000 national jobs), and receptionist and information clerk (5,100 Ohio jobs, 85,000 national jobs).  Tr. 89-90.

The ALJ asked the VE whether such an individual could perform those jobs if the individual could not perform tasks requiring constant use of the left non-dominant hand for fingering or repetitive activities in production-type jobs.  Tr. 90.  The VE answered that such an individual could perform those jobs.  Tr. 91.  The ALJ asked the VE whether the hypothetical individual could perform any jobs if the individual was unable to engage in sustained work activities for a full eight-hour day on a regular and consistent basis.  Tr. 91.  The VE answered that there would be no jobs for such an individual.  Tr. 91.

Next, Stimson's attorney asked the VE whether a hypothetical individual of Stimson's age, education and work experience could perform any work if that person had the following characteristics: can lift no more than five pounds; can stand and walk for a total of two hours in an eight-hour day for a half-hour without interruption; can rarely climb, balance, stoop, crouch, kneel, crawl, reach, handle, feel, push, pull, and perform fine and gross manipulations; would need breaks in addition to the morning, lunch and afternoon breaks, and would require a sit/stand option.  Tr. 92.  The VE answered that he would consider such a person unable to work if she had just two of these conditions: the need for an extra break and the ability to only rarely reach,

handle and/or finger.  Tr. 93.   The VE further stated that the five pound restriction would place the individual below sedentary work.  Tr. 93.  Finally, the VE testified that, anyone with all those limitations would be precluded from employment.  Tr. 93.

Stimson's attorney asked the VE whether a hypothetical individual of Stimson's age, education and work experience could perform any work if that individual would be off-task at least fifteen percent of the work shift.  Tr. 93.  The VE answered that there would be no work such an individual could perform.  Tr. 93.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a

severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his February 22, 2012, decision, the ALJ made the following findings:

1.  The claimant last met the insured status requirements of the Social Security Act on September 30, 2010.  Tr. 38.

2.  The claimant did not engaged in substantial gainful activity during the period from her alleged onset date of November 4, 2008 through her date last insured of September 30, 2010.  Tr. 38.

3.  Through the date last insured, the claimant had the following severe impairments: hypertension (s/p cerebrovascular accident in November 2008 and cerebral aneurysm) and degenerative disc disease.  Tr. 38.

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 38.

5.      Through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she is limited to simple, routine, repetitive tasks and cannot perform work at unprotected heights or around dangerous or moving machinery. Further, the claimant cannot perform tasks requiring constant use of the left, non-dominant hand for fingering or repetitive activities in production type jobs.  Tr. 38.

6.      Through the date last insured, the claimant was unable to perform any past relevant work.  Tr. 47.

7.      The claimant was born on December 15, 1962 and was 47 years old, which is defined as a younger individual age 18-49, on the date last insured.  Tr. 47.

8.      The claimant has at least a high school education and is able to communicate in English.  Tr. 47.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 47.

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.  Tr. 48.

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from November 4, 2008, through September 30, 2010, the date last insured.  Tr. 49.

## V. Parties' Arguments

Stimson objects to the ALJ's decision on two grounds.  She argues that the ALJ erred in

failing to give substantial weight to the opinion of her treating neurologist, Dr. Madalin, and that

the ALJ's residual functional capacity ("RFC") assessment is not supported by substantial

evidence.  Doc. 15, p. 1.  In response, the Commissioner submits that the ALJ reasonably

considered Dr. Madalin's opinion and that his RFC assessment is supported by substantial

evidence.  Doc. 18, pp. 10-17.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681

(6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor

resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d

383, 387 (6th Cir. 1984).

### A.  The ALJ did not err when assigning weight to Dr. Madalin's opinion

Stimson argues that the ALJ improperly applied the treating physician rule with respect

to the opinion of Dr. Madalin, her treating neurologist.  Doc. 15, p. 10.  Specifically, Stimson

asserts that the ALJ erred in giving greater weight to the opinion of Dr. Saghafi, the consultative

examiner, than to Dr. Madalin's opinion.  Doc. 15, p. 10.  Under the treating physician rule,

"[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion

well supported by medically acceptable clinical and laboratory diagnostic techniques and not

inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc.

Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  A treating source is an

acceptable medical source who provides, or has provided, a claimant with medical treatment or evaluation and who has had an ongoing treatment relationship with the claimant. *See* 20 C.F.R. § 404.1502.  The commissioner will generally consider there to be an "ongoing treatment relationship" when the medical evidence establishes that a claimant is or has been seen with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for a claimant's medical condition.  *Id*.  "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once[.]"  *Kornecky v. Comm'r of Soc. Sec*., 167 Fed. App'x 496, 507 (6th Cir. 2006) (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)). The plaintiff has the burden of showing that a doctor is a treating physician.  *See id*. at 506-508 (plaintiff failed to show doctor was a treating physician and, therefore, his opinion was not entitled to presumptive weight per the treating physician rule); *Walters v. Comm'r of Soc. Sec*., 127 F.3d 525, 529 (6th Cir. 1997) (claimant has the burden of proof in steps one through four). Before determining whether the ALJ complied with the treating physician rule, the court first determines whether the source is a treating source.  *Cole v. Astrue*, 661 F.3d 931, 931, 938 (6th Cir. 2011) (citing *Smith v. Comm'r of Soc. Sec*., 482 F.3d 873, 876 (6th Cir. 2007)).

Here, the ALJ pointed out that Dr. Madalin treated Stimson on an annual basis and had only seen her twice at the time she completed her report.  Tr. 46.  *See Kornecky*, 167 Fed. App'x at 506, n. 10 (visits to a physician after the physician completes an RFC form "do not retroactively render him a treating physician at the time of the assessment.").  Stimson does not advance evidence that Dr. Madalin is a treating physician whose opinion is entitled to controlling

weight.  Thus, the ALJ was not required to assign controlling weight to Dr. Madalin's opinion.

*See id.*

Pursuant to 20 CFR § 404.1527(c), the Commissioner weighs medical opinion evidence that is not entitled to controlling weight based on the following: the examining relationship; the treatment relationship; the supportability of the opinion; the consistency of the opinion with the record as a whole; the specialization of the source; and other factors.  With respect to Dr. Madalin's opinion, the ALJ explained,

> [Dr. Madalin] opined that due to left hemi paresis, the claimant could lift only five pounds and could stand or walk only two hours in an 8-hour day.  She further opined that the claimant's left hemi paresis prevented the claimant from climbing, balancing, stooping, crouching, kneeling, crawling, reaching, handling, feeling, pushing, pulling, or performing fine or gross manipulation, though she noted the claimant did not use a cane, walker, or brace.  She opined that the claimant needed a sit-stand option.  Dr. Madalin stated that the claimant's frequent migraines caused the claimant severe pain, and opined that she would be unable to work when having a migraine.  The undersigned notes that Dr. Madalin treated the claimant on an annual basis, having treated the claimant only twice at the time of her report.  She did not offer any objective evidence to support her diagnosis of left hemi paresis, and the available medical evidence is inconsistent with her conclusions. Her opinion that the claimant would be limited by severe migraine pain is inconsistent with evidence that at the time of Dr. Madalin's report, the claimant was using only Tylenol to treat her migraine pain.  Later medical records indicate the claimant's headache pain is controlled with medication.  The undersigned finds Dr. Madalin's report poorly explained and unsupported by the evidence and gives it little weight.

Tr. 47.  The ALJ's stated reasons for assigning little weight to Dr. Madalin's opinion complied with the regulations; he properly considered the treatment relationship and the supportability and consistency of Dr. Madalin's opinion.  *See* 20 CFR § 404.1527(c).

Stimson argues that there is evidence to support Dr. Madalin's opinion of severe limitations.  She identifies Stimson's subjective reports of her symptoms and Dr. Madalin's October 6, 2010, treatment note indicating that Stimson had a slightly unsteady tandem walk, mild weakness in her left arm, and ¼ reflexes.  Doc. 15, p. 11; Tr. 443.  However, during the

same visit, Dr. Madalin observed a symmetrical face and tongue, normal heel to toe walking, a normal Romberg test, 5/5 strength bilaterally in Stimson's lower extremities, normal coordination, muscle tone and sensation, and no need for an assistive device. Tr. 443. The ALJ also commented that Stimson: regularly denied neurological symptoms stemming from her stroke in November 2008; repeatedly stated that her symptoms resolved within 48 hours; and first reported she was unable to work the day after she applied for social security benefits. Tr. 45. Thus, it was reasonable for the ALJ to conclude that there was a lack of objective evidence to support Dr. Madalin's diagnosis of left hemiparesis.

Regarding Stimson's headaches, the ALJ found that Stimson was not credible and that she exaggerated her symptoms. Tr. 46. Specifically, the ALJ explained that Stimson was taking Tylenol to treat her headaches at the time of Dr. Madalin's report, that later records indicate that Stimson's headache pain is controlled by medication, and that Stimson testified that medication helps her headaches. Tr. 45, 47, 68. *See Helm v. Comm'r of Soc. Sec.*, 405 Fed. App'x 997, 1001 (6th Cir. 2011) (modest treatment "consisting solely of pain medication [ ] is inconsistent with a finding of total disability.").

In sum, the ALJ followed the regulations when he assigned little weight to Dr. Madalin's opinion; his decision is supported by substantial evidence and, therefore, must be affirmed. *See* 20 CFR § 404.1527(c); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (The Commissioner's decision cannot be overturned so long as substantial evidence supports the ALJ's conclusion).

### B. Substantial evidence supports ALJ's RFC assessment

Stimson argues that medical records support more restrictive mental limitations than those assessed by the ALJ in his RFC determination. Doc. 15, p. 12. Specifically, Stimson

asserts that the ALJ erred because he failed to provide all the mental restrictions included in the opinions of consultative examiner Dr. Wax and the state agency reviewing physicians.  Doc. 15, p. 15.

The ALJ limited Stimson to performing simple, routine, repetitive tasks.  Tr. 38.  In discussing Dr. Wax's opinion, the ALJ explained that Dr. Wax opined that Stimson could understand, follow and remember simple instructions and perform at a normal pace.  Tr. 46.  He commented that Dr. Wax observed that Stimson was persistent with tasks, did not present any problems focusing or attending to tasks, and that he observed no memory problems.  Tr. 46.  Despite these findings, Dr. Wax opined that Stimson was moderately limited in her ability to relate to others; understand, remember, and follow instructions; and maintain attention, concentration, and persistence.  Tr. 46, 398.  The ALJ commented that Dr. Wax's opinion, i.e., that Stimson was moderately impaired in her ability to relate to others, was inconsistent with Dr. Wax's own observations during the evaluation; namely, that Stimson presented with "good social skills" and that she would have "little difficulty working with others on a job."  Tr. 46.  *See* 20 CFR § 404.1527(c) (when weighing opinion evidence, the ALJ considers the supportability and consistency of the opinion).  Stimson's assertion, that the ALJ did not explain why he failed to place any social limitations in his RFC assessment, is without merit; the ALJ sufficiently explained why he left out social limitations in his RFC assessment.  Furthermore, although the state agency reviewers placed greater restrictions on Stimson than the ALJ's RFC assessment, the agency reviewers relied heavily upon Dr. Wax's opinion, as the ALJ noted, and thus their opinions suffer the same inconsistency as Dr. Wax's opinion.  Tr. 47.

Finally, Stimson asserts that the ALJ's decision should be reversed and remanded because the ALJ stated, "evidence submitted at the hearing level shows the claimant is slightly

more limited than found by the medical consultants," but went on to assess a mental RFC that was less restrictive than the opinion evidence, thereby committing error.  Doc. 15, p. 13; Tr. 47. The Court notes that the ALJ assessed a *physical* RFC that was more restrictive than the opinion evidence.  *See* Tr. 375 (Dr. Saghafi's opinion that Stimson can lift/carry up to 35 pounds frequently, up to 70 pounds occasionally, and had no left hand limitations); 419, 557 (state agency reviewers opining the same).  Thus, it is not clear that the ALJ was referring specifically to the mental evidence in the sentence Stimson cites, contrary to Stimson's assumption. Regardless, the ALJ's RFC assessment is supported by substantial evidence, as explained above, and his decision must be affirmed.  *See Jones*, 336 F.3d at 477.

### VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**

Dated: July 9, 2015

Kathleen B. Burke
United States Magistrate Judge